Alejandro Aguilar Diaz et al v. Bondi May it please the court, parole is nothing more than a release from custody. The parties all agree that at the time the petitioners were released from custody, they were subject to mandatory detention under Section 1220. Hang on a second, I'm going to push right back. We've said, are you suggesting this unity of parole? There's only one kind of parole, all parole is the same parole? No, not at all. Okay. So parole is more than release from custody. I mean, there are two kinds of parole, right? Before we go anywhere, I just want to make sure that we've held what's the name, Cruz Miguel, what's the name of the case? We held, right, that humanitarian parole is not the same as conditional parole. We're not going to fight that battle, right? No, not at all.  But under Lengmay Ma v. Barber, parole under 1182 D-5 is simply a release mechanism when someone is not entitled to seek release. So basically 1226 conditional parole is when the government has discretion to release the person. Humanitarian parole 1182 D-5 is when that discretion does not exist, as is the case of 1225 D-2. That's how the statutes have worked since the 1952 Act. Yeah, but you agree these are two different things we're talking about. Yes, absolutely. Okay, good. I just wanted to make sure you weren't starting with the premise that all parole is the same. Got it. No, not at all. We recognize there's two different frameworks. They are independent of each other and mutually exclusive. Our claim is that our clients were under the 1225 B framework when they were detained and released. And the only legally possible— How do you get there rather than 1226, which is what apparently they were released under, at least in terms of the documents? So setting aside the documents, Your Honor, I think we have to look to the law first. It's substantial reform. So the law, they were applicants for admission under 1225 A-1. We all agree on that. They were arriving in the United States as opposed to just simply being present. And if we look to 1225 B-2's language, it applies to applicants for admission, which my clients were, and they were in the process of seeking admission because they were arriving at the border. So then they fit within the plain terms of 1225 B-2. Now, I understand in the past it has been understood that there's an overlap between 1225 B-2 and 1226, but after Jennings v. Rodriguez, that's not the case anymore. And the government agrees from my understanding of their brief on that. Yeah, well, maybe you're all wrong. But I guess I have another question. Go ahead. It seems like we're engaging—there's two debates here, right? One is what should they have been detained under and how should they have been released? And one is how were they detained and how were they released? And I understood that for adjustment of status, the question is whether they were paroled, right? Yes. They were paroled, right, in fact. Yes. So let's say for the sake of argument that an I.J. They come before an I.J. And the I.J. said, I invoke the Bail Reform Act of 1984 and I release you because that's what criminal law says. And we look back and I say, well, that's nuts. Criminal law has no application here. But would you say, oh, so they must have made humanitarian parole decisions. They must have engaged in the public benefit or the humanitarian benefit analysis. Well, we know that they didn't. Would you say, well, even though the judge didn't parole them, you seem to be trying to say, well, he ought to have paroled him. But we know he didn't. So why are your argument is this historical revisionism argument that's saying, yeah, it doesn't really matter what the immigration authorities did. It's what they ought to have done. Why, why do we, why would we do that? Why would we engage in analysis of not asking what happened, but what ought to have happened? Because of the rule of law, Your Honor. It's a legal impossibility. Okay, so let me take my hypothetical. Crazy immigration judge invokes the Bail Reform Act. They acted illegally. But you're saying they were, in fact, paroled? Why can't judges make mistakes? Why can't immigration authorities make mistakes, do things that, in your view, are totally wrong? But then you would say, well, I'm going to deem them to be something that was right, even if it's not something they ever did? Stick with my hypothetical. Well, with the immigration judge, they don't have parole authority. So there's no situation where one could claim that an immigration judge has paroled somebody. But let's say DHS. Let's say DHS said, I invoke the Bail Reform Act of 1984, and I release you. The actions of an administrative agency must always be judged by their authorized, the authorizing acts, the law. So let's say, then, they weren't authorized to do that. They did something unauthorized. Let's accept that, then. Because that's why I gave you a ridiculous hypothetical, so we can all agree they acted completely ultra-virus. I think this is a debate about whether to call it a tomato or tomahto. No, no, I'm saying tomato watermelon. They came in and they, no, I'm serious. They said Bail Reform Act of 1984. Just stick with my, I'm taking an extreme hypothetical to illustrate what might be the limits, hang on, of, let me again call it historical revisionism. If an agency does something completely ultra-virus, in your view, do we get to recharacterize it and basically say, even though we know for a fact they invoked a criminal law, because the only way that they could have legally released them, assuming, is through humanitarian parole. We have to pretend that that's what happened. Isn't that basically what your argument is? No. So, going back to the Cole de Bella memo and the old INS memos, in 2007, DHS made a decision, oh, this is how it was working back then. Even if we use the wrong paperwork, we're going to treat them as parole. But we don't like that they're getting benefits if we do that. So we're just going to change the way we view the statute and start giving them this piece of paper. But you've got to convince us that's right. I mean, maybe INS was right or maybe they were wrong, but you've got to convince us that the historical revisionism is correct. That you can go back and say X happened in the past, but we're all now going to act like Y happened. So, in Matter of O, the BIA's own precedent in Matter of O was 125 Cambodians that were brought into the United States on a plane and they were given some document that was not parole, and they needed to be paroled for whatever purpose they were seeking in their proceedings. And the board said, no, that could not have been parole. The law says when you're trying to enter the country, you're supposed to be detained, and the only way you could have been released was parole. They treated them as parole. They declared that the act of the release was a parole because it's the act of the release that we're talking about. It's not the piece of paper. They could have given them no paperwork at all. I mean, I get it. You're talking about the BIA that said that. And the Vitale v. INS in the Seventh Circuit. What about us? Have we ever said that? No, this Court has not done. We've never gone back and said, even though an agency did X in the past, because we conclude that X would have been illegal, we're going to pretend that actually Y happened, because Y is the only thing they could have legally done. I would say that Congress made that decision with the IRIRA, because under the reenactment canon, when there's agency precedent and case law from the courts of appeals in place with certain understandings and the Congress does a full overhaul of the statute and does not disturb any of those precedents, it's understood to have adopted and continued that practice. And that has to be sort of a widespread and understood, generally understood practice. Where did we get that from? It sounds to me like, hypothetically, a few things may have happened here and there. Well, matter of O is of a national precedent. It applied across the whole country. And it came after Vitale and Medina Fernandez. And how did IRIRA memorialize that? It never changed it by not changing it. Tell me what's the it. I don't think there was anything in the statute that said something like the BIA said, oh, this allows us to recharacterize what happened in the past and now that statutory language is there. I think you're just saying that there is a practice that happened maybe once, maybe multiple times. Congress never passed a law to prohibit it, but I don't see that there was a root piece of statutory language that authorized this recharacterization that was never amended. Is there? Or is there some statute that says thou can engage in historical relations in whatever language you want? I understand how you're looking at the issue. In what is a statutory language. No, there's no statute. What I'm saying is that when Congress. So hang on. If Congress enacts a statute, we assume that how the courts have been applying, have been interpreting and applying the statute has been sort of implicitly reenacted, right? When there's a major overhaul. So that's the reenactment canon. What's the part of the statute that you're saying that by reenacting X provision, they have now adopted. 1182 D5. So the parole statute, the parole provision was written in 1952. And I'm sorry, this is not in the briefing. If we could do supplemental briefing or the court would allow it, I'd be happy to get. We'll tell you if we need briefing. So you're saying that simply by reenacting 1182 D5, which is the humanitarian parole, that. This is Supreme Court doctrine. It's the reenactment canon. It's generic. So what I'm saying is the 1182 D5 has never been changed, except for the case-by-case determination language. But it doesn't have to do with the core entirety of the statute. 1225B was a mandatory detention statute prior to IBRIRA. They modified it. But these schemes of interlocking provisions were always there. The courts of appeals and other circuits began looking past the documents and saying the law controls apply to the facts. The board did it in a national precedent. Congress is presumed to have been aware of that. And when Congress is in the process of overhauling the entire statute, administrative practices, at least ones of national scale, such as matter of oath, if they're not directly changed, they're presumed that the old soil comes over. So let me ask you this. And nothing in IBRIRA overturns any of this. Yeah, so with all the enactments and overhauls, are you saying then that your argument under 1225 is completely wrong? Because hasn't Congress continually been reenacting all of these various chunks and pieces of the immigration statutes that were consistently applied not to adopt your underlying theory of 1225? It seems to me that you're treading on dangerous ground when you say, well, implicitly, whenever Congress keeps overhauling these statutes, they're implicitly adopting all of the administrative practice. But they've never changed it. Right. My point is that if they've never changed 1225, then how do you even get to your underlying theory that your clients were actually secretly all along being detained pursuant to 1225, that Congress has been reenacting these statutes all along with a consistent administrative practice, that people were not being detained under 1225? How do you get that? 1225 was expanded in its scope. So before 1225 only applied for someone arriving at a port of entry. We're saying that under IBRIRA it was expanded, and that scoops in people like my client. They were subject to mandatory detention. Now, the concept that you can look to the detention statutes and the release statutes is something different. The idea that you can look at it and determine that as a matter of law, what really happened was parole versus what the paperwork says, that's a separate issue. That has never been changed by Congress. So if you separate those two concepts, the change is that persons like my clients are now subject to mandatory detention, but our reliance on the procedural regularity doctrine, which has been started with the courts of appeals in the Seventh and Ninth Circuit in the 50s and 70s, the board adopted it a matter of oh, and Congress has never changed that. That has been undisturbed. The board has never changed that precedent. It's still in place. First of all, the agency is still bound by that decision a matter of oh, which they didn't follow and just seemed to ignore. We did bring it up in our brief. So that right there is an abuse of discretion on the board by failing to follow its own precedent. But even then, what I'm saying is that that precedent that's still in place with the board, Congress chose not to disturb it and it's presumed to have adopted it and that the courts of appeals, therefore, can do what the board did a matter of oh, and in the Medina-Ferdinand case and in the Vitale case. And I see I've well past my time. Yeah, you've reserved some time for rebuttal. We'll see you again. You've reserved two minutes, so why don't we hear from the government. Thank you. May it please the Court. My name is Jonathan Robbins, and I'm here on behalf of the United States Attorney General. Good morning to your honors. The key issue in this case is whether the Board of Immigration Appeals properly upheld the immigration judge's pretermission of the petitioner's applications for adjustment of status under the Cuban Adjustment Act. In order to be eligible for Cuban adjustment, the petitioners had to show, among other things, that they were either admitted or paroled into the United States. And the board upheld the immigration judge because the record unequivocally demonstrates that the petitioners were released on their own recognizance under the 1226 framework. They were granted conditional parole, and under board precedent and this court's precedent, as your honor mentioned, the Cruz Miguel case, that conditional parole is not sufficient to meet the admission or parole requirement for Cuban adjustment. Now, I think your honor has it right when you've characterized the petitioner's argument. He's left basically to argue that even though his client was not granted humanitarian parole, because he should have been detained under the 1225 framework, he effectively wants to convert the grant of conditional parole into a grant of humanitarian parole. But there are numerous problems why the court shouldn't do that, and I think the best place to start is probably with the statute. The parole statute itself places the discretion for granting humanitarian parole with the Department of Homeland Security. So if this court were to, in the first instance, create a legal grant of humanitarian parole, it would effectively be usurping the discretion that the statute puts with the Department of Homeland Security. That reminds me, then, the facts of this case, the record. Who issued the order of conditional parole? That was when DHS released him. Those orders are located in the record at, I think it's 40. Sorry, let me just get the exact page here. These are the orders that should be. If you can just point to the page of the administrative record, it's probably easiest. Sure. Just one moment. I just want to make sure I'm understanding. So it starts on page 221. That's a list of the different warrants for arrest and the notice of custody determinations, and interspersed with those are the three different orders of release on recognizance. So the first one, they're sort of interspersed. The first one is on page 225 of the record. The next one is 227. That's signed by an ICE official, right? Yes. That's an ICE form, yes. So I guess. Could you finish? I like that. You had three of them. Oh, sorry. 225, 227, and the last one is. Sorry, I just lost my place here. It looks like 234. So those are the documents, order of release and recognizance with the various addendums. Right. Signed by an ICE official. I just want to make sure I'm understanding this narrow, at least this piece of your argument, where you say recharacterizing a grant of conditional parole to humanitarian parole would usurp the authority of DHS. But the ICE official who releases someone on recognizance is a DHS official, right? Yes. So it's not so much that we would be usurping the authority of DHS in the sense of we would be saying that some other non-DHS official was allowed to do it, like say an IJ or something. We would simply. I think what they're asking us to do is to say, no, no, this is DHS acting, and we're telling you what DHS did. So there's no real usurping and saying, well, someone else is making the decision. We're saying, no, no, this is what DHS did. So I guess I'm not, unless you're saying the very act of recharacterizing what DHS did is the usurping of DHS's authority. Is that what you're saying? Well, here's the problem, and this was actually getting to the next thing that I was going to talk about. If you look at the parole statute at 1182 D-5A, it does say that this is in the discretion of the Department of Homeland Security, but it doesn't stop there. It cabins that discretion to limited circumstances. They use the word only, and it says that DHS is only supposed to exercise its discretion to grant parole on a case-by-case basis when there is a humanitarian concern or a significant public benefit. And so what I'm talking about usurping there is not just discretion. You would essentially be having to make factual findings that DHS has never made about whether there's a humanitarian concern and whether there's a significant public benefit. Would we have to, or again, hypothetically, if we accept your opponent's invitation, we're simply saying that must be what DHS did. We're not making any findings. We're just going to assume that DHS must have made those findings. They didn't put them on the record, but I guess they were in the ICE official's head. But we know that that's not what happened, though, because we have the evidence that shows that they were released on conditional parole. And it says, and I'm just looking at page 225, which is the first page, and it said, in accordance with 236, which is 1226, right, of the Immigration and Nationality Act, you were being released on your own recognizance. So your view, as I understand it, is this is documentary evidence. If we're wondering what happened in the past, if we're wondering what happened in 2021, we have contemporary evidence that the agency was acting pursuant to 1226. Exactly. And that really can't be changed. That's a matter of historical fact. There are things the court can do by operation of love, but you can't change the fact of what happened. And the problem is that it would be one thing to say that you could maybe say something is equivalent if we were looking at interchangeable cause. If conditional parole were something equivalent to humanitarian parole, then maybe you could, you know, figure out some way to say that they're interchangeable. But these are two totally different things, and that's one of the things the court has talked about specifically in the Cruz-Miguel case. It talks about the very specific differences between these two different privileges, right? One of them grants work authorization. One doesn't. There are very substantive differences between this. So the appropriate remedy here is not for the court to grant something that's DHS's discretion to grant based on facts that have never been found. Because, again, DHS is only supposed to do this in limited circumstances by congressional mandate, right? Congress put this into the statute. So how does the court do that by operation of law and say by operation of law there is a significant – It can get taken away. So without knowing whether those facts and circumstances warrant a grant of humanitarian parole, how can the court – or why would it be appropriate for the court to convert a conditional parole into humanitarian parole? It wouldn't make sense. The fact is lurking in the background, or I suppose in the foreground if you're the case of the petitioner, is the government's new position which opposing counsel shares, which is people like petitioners are now subject to mandatory detention under 1225. They're not subject to detention under 1226. Is there any reason if we were to agree with the government that we would need – this court would need to engage with that issue? Not in this case. So answer that. And then the second question I will have is – maybe this is a question for the other side. Would we, however, need to engage in that if we wanted to rule in favor of the petitioner? Okay. So just to clarify, if the court disagrees with the government's new position – this is a new position that's been recently introduced, this interpretation of the statute – if the court disagrees and thinks the government is wrong in this new position, then the case is open and shut. Then DHS did properly detain petitioner under 1226, issued conditional parole, and Cruz Miguel would foreclose the petitioner's argument. That's the simple way if the court disagrees with the petition. If you agree with our position, I don't think it matters to the outcome of this case. No, my point, if I wasn't clear, do we even need to agree or disagree to take the position that I think the government is taking, which is whether the petitioners were granted humanitarian parole is a question of fact and not of law. And the facts are shown on page 25, et cetera, of the record. If we were to adopt that position, would this panel be required to even engage with the question of whether the government's right about this more sweeping issue about whether people ought to be subject to detention under 1225 as opposed to 1226? No, you would not need to engage with the 1225-1226 issue. And then I think this is where I was going to maybe un-rebuttal counsel and answer this, but my understanding is that in order for the petitioner to win, we would have to engage in that analysis, and we would have to agree with both of you that yes, in fact, 1225 is the only proper way that the petitioners could have been detained. I think that's correct, yes. And then we'd have to take the second step of saying, and we should recharacterize what was done in the past to conform to our understanding of what the law provides. Right, because there would certainly be no basis to recharacterize conditional parole as humanitarian parole if it's not the 225. Just to clarify something for me, to what extent were these arguments that you're making, your adversaries are making now, presented to the BIA? Well, the petitioner actually, it's a little bit unusual. Most of the time with the 1225 argument, the immigration bar takes the position that 1225 does not apply to situations like the petitioners are in. But the petitioner did argue before the immigration judge and before the board that 1225 was the detention authority that he should have been detained under. Now, at the time, the government disagreed with that because for a long time, up until the new administration, the government was treating 1226 as the appropriate detention authority. That position has changed, and that is currently being litigated. In fact, I think it's coming up in a case before this court as well. It's beginning to percolate in the courts of appeals. That may be the argument. My question is the BIA's views are not known on this. Is that accurate? Well, the BIA's views are known on the 1225 issue. The BIA has agency decisions, and they're actually cited in the 28J filed by the petitioner. Matter of Hurtado and Matter of Kew-Lee, Matter of Hurtado is the one that's most directly on point with respect to the applicability. Don't they conflict with prior rulings, which are still operative with regard to 1225 and 1226? Well, they conflict with the government's prior practice, but I don't think they conflict with prior board decisions. One of the things that the board discusses in the Hurtado case is that it hasn't been really addressed. So I mean, I think this- The only question I have is whether there's room for the BIA to be heard on these questions. Neither of you are asking for any of that, but one question would be, and I know that this was raised in the 11th Circuit, that perhaps it ought to be sent back to the BIA. I'm just wondering what your views are on that. Our view is that it's not necessary in this case. I mean, I don't think there's any harm in doing it because the board can't- If it goes back to the board, the board can't grant parole, right? It can't grant humanitarian parole. I understand that. You know, Loeb or Bright is in place. So there's no Chevron deference in this case. But by the same token, if the board rules, given all the new information that it would have, we might be helped by that. Or we might not be. And it's sort of like sending a case back in this context to the district court in which we ask the district court to sort through these issues, which, at least for me personally, are not simple. They're quite complicated, and they depend upon what happened over different periods of time and the effect of certain provisions. And then the government changes its position. So why wouldn't we want to send it back just for the benefit of getting another judge to look at the problem or judges to look at this problem before we actually have to make a decision? Well, Your Honor, if the court thinks that it would benefit from a board decision, I don't see any harm in sending it back. Well, benefit or not benefit. I mean, board decisions might be right. They might be wrong. That's true of district courts when you send cases back. Fair enough, Your Honor. But that's the government's point as to why we don't think it's necessary, right? So, I mean, if you want the board to opine on it, I mean, it will take a lot longer. Well, maybe it's not necessary. It'll take a lot longer. Following up on Judge Walker's question, what would the government do if we were to remand it? Would your position basically just be a replay of your red brief here? Or what would the government say to the BIA? Well, if you remanded the case and vacated the order of removal, well, the vacating of the order of removal would mean he'd fall under 1225. So this is where it gets a little complicated. So the government's position is certainly that 1225 applies as the detention authority and that detention is mandated for individuals in petitioner situations. I'm not sure I should know this. Are they presently detained? No. No. But if we remanded it, the government would take the position that 1225 applies? Would you then take the position that they should be mandatorily detained? Yes. However, I want to sort of explain the practical implications of that. So the government's position in the 1225 litigation is that it doesn't have an affirmative duty to go out and get people. It's sort of like prosecutorial discretion. If they encounter them, they're mandated to detain them. But they don't have an affirmative duty to go out and, you know, find people who are subject to mandatory detention. That's the government's position in that course of the 1225 and 1226 litigation. So your position would be 1225 would control, but they were not paroled under 1225. They were paroled under 1226. Correct. To adhere to that position. Correct. And there's one other sort of wrinkle here that I think is worth pointing out. Before you get to the new wrinkle, does this depend on the date on which they were detained? No, Your Honor. The application, the applicability of 1226 or 1225, does that depend on the date that they were, when they were detained? Well, the government took it at the time they were detained in 2021. The government was taking the position that 1226 was the controlling statute. The government now has taken the position that that was not correct, that it should have detained them under 1225. That's been the change. Regardless of whatever, what date it was and what stage they were detained. Right. But just to sort of talk about this wrinkle that I was discussing, when the petitioner is released, they can still apply for humanitarian parole. Right? It's sort of colloquial known as parole in place. Normally, when somebody applies for parole, they're for people outside the country. But people inside the country can apply for humanitarian parole. So when they were released here, I mean, the petitioners are saying, well, it's the only way we could have been released. It's so you should say that this was humanitarian parole. But even after their release, they could have theoretically sought it before DHS. I don't know that they would have been granted. But, again, are you saying that they could still do it? To be correct, under 1225, to follow their argument, they don't deserve humanitarian parole. They just become they could become the best you could do is to say they become eligible for it. Right. They would be eligible. But then it has to be ruled on administratively. Right. DHS would have to determine by statute whether there was a humanitarian concern or a significant public benefit. That's what the statute says. It says it can only be granted on a case-by-case basis if those factors are met. Are you suggesting that if there were a hypothetical remand to the BIA and the government took the position that now 1225 would be the statute governing their detention or potential detention, that the government would view them as eligible or in a place where they could seek humanitarian parole at that point? Yeah, if that's the mechanism by statute. Would you then be taking a position, though, that they're sort of stopped as a litigation matter from claiming that they already got humanitarian parole if they're now asking for it? You know, does that put them into a catch-22 where to ask for something that you think you already have is sort of admitting that you don't have it to begin with? Oh, I see what you're saying. Well, if the court ruled and said that the government was the conditional parole doesn't exist and it was actually a grant of humanitarian parole. Well, sure. We say it's done, but I'm talking about the hypothetical remand situation where everything's in play before the BIA. You seem to be suggesting they could still ask for humanitarian parole. I'm asking whether that puts them into some sort of a bind because if they ask for it, is it going to be viewed by the government as an implicit admission that they didn't have it to begin with? Because why would they ask for something that they say they already have? Well, I mean, I'm just saying that because the facts show that they didn't get it and that they were granted, as a matter of fact, they don't dispute that they were granted conditional parole. No, I know, but this has become another quiver in the arrow, or another arrow in the quiver of the government to say, and it's yet more proof that even you are effectively conceding petitioners if you don't have it because if you did have it, not only does the paperwork show it, but your very request for humanitarian parole shows that you think you don't have it. Yeah, I know, the red light's on. Keep going. Oh, sorry. Well, I mean, I understand what Your Honor's point, but I mean, I don't know that I can say anything other than what I said. They can go to DHS at any time. DHS has the discretion. There are forms to file. They can ask for parole. If they're applying for Cuban adjustment, one of the requirements is parole. If they don't think they've been paroled, they can go and ask DHS for parole. I'm not suggesting it would be granted. I'm not trying to create a false hope. There's one final thing that the petitioner mentioned in that case, matter of O. Matter of O preceded the current statutory scheme. It was based on a parole statute. The parole language is different. It's similar but different. DHS didn't actually exist at the time of matter of O, so the parole statute there had to do with the attorney general's discretion. This is 1977, right? Matter of O, I think it might have even been. I think it might have. I don't remember the year, Your Honor, but that was a different. There was a different language in that parole statute. It was slightly broader in terms of discretion. As I explained, this current version uses the word only. It says it can only be used on a case-by-case basis for humanitarian concerns. The language of that prior parole statute for the attorney general in matter of O was slightly different. It didn't have the term only. It was similar language like emergent reasons or humanitarian concerns, but it didn't cabinet quite in the way that the current statute cabinets it. So I don't know that that announced. I would also point out that in matter of O, there wasn't a fact that showed demonstrably that they did not get a grant of parole. They were sort of figuring out, well, was it parole or was it not? Here we have definitive evidence that shows they got conditional parole, which case law makes clear is not a grant of humanitarian parole. So unless Your Honor has any more questions, thank you very much for your time. Thank you very much. Mr. Prada, you've got two minutes for rebuttal. So if there's anything you would like to follow up on. Yes. We'll try to keep it to two minutes. Yes. Looking to the record, the petitioners entered the United States July 26, 2021. A warrant was not issued until 11 days later on August 6, 2021. You cannot detain someone under Section 1226A without a warrant. It's arrest upon a warrant. However, 1225 is warrantless arrest. So looking to the facts and the record, they were detained under 1225 until 11 days later that the government decided to paper it as something different. And this is an argument we put before the board. Going back to your Catch-22 question, that's actually a problem that has arisen in one of our cases in the Southern District of Florida where we're trying to certify a class and the government is arguing a lack of commonality because some of the named plaintiffs did seek parole in place while others did not. So for your question, yes, that is something that would complicate the case for us. And we don't know what an IJ or the board would say, and it just adds an extra wrinkle and more problems for us. This is to go back to Judge Walker's question. If we were to remand this thing to the BIA, to let the BIA think about it, how would it play out in your mind? Not how would the BIA rule, but what would your pitch be to the BIA? Essentially the same brief we already filed. But citing matter of Q. Lee, and that's also your question about how far you need to interpret 1225B or not, there's the two cases, matter of Q. Lee and Hurtado. Q. Lee is the much narrower view, which we are arguing is correct. The Hurtado case is the one in the habeas litigation across the country. So if the court focuses only on Q. Lee, it's actually not touching upon what's happening in the habeas cases, right? But to your question again, I don't think there's any conflict between the board's decision in Q. Lee and any of its prior precedent. There's no reason for the remand. There's nothing for the board to elaborate upon. We presented the issue to them squarely, that it is today, and our argument will not change. Thank you, Your Honor. All right. Thank you both very much. We will take the case under review. We appreciate the arguments.